AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Indiana

SEALED

United States of America )
v. )
 )                    Case No.
 )                        1:21-mj-0706
 )
MATTHEW HARRISON )
 )
_____
*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  September 2020 - February 3, 2021  in the county of                Marion                in the

Southern         District of                Indiana        , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 USC 841(a)(1) and 846 | Conspiracy to Possess with Intent to Distribute 500 grams or more of Methamphetamine |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

_____
/s/Todd Bevington
*Complainant's signature*

_____
Todd Bevington, ATF, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by
 telephone                             *(reliable electronic means)*

Date:      7/29/2021
_____

City and state:              Indianapolis, Indiana
_____
Paul R. Cherry
United States Magistrate Judge
Southern District of Indiana

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Todd J. Bevington, being duly sworn under oath, states as follows:

## TRAINING AND EXPERIENCE

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice. I am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.      I have been employed with the ATF since December of 2013, and I am currently assigned to the Indianapolis Field Office, Crime Gun Intelligence Center (CGIC). Prior to my employment with the ATF, I was employed as a police officer and detective with the Richmond, Virginia, Police Department for over thirteen years. I spent approximately ten of those years assigned to various firearm and narcotics enforcement units, including over seven years with the Special Investigations Division-Narcotics Unit, Major Cases Team. I was also assigned as a Task Force Officer (TFO) to the Federal Bureau of Investigation (FBI)-Safe Streets Task Force. In connection with my official law enforcement duties, I investigate criminal violations of state and federal firearms and narcotics laws, including but not limited to, Title 18, United States Code, Sections 922 and 924; I also investigate criminal violations of money laundering laws, including Title 18, United States Code, Sections 1956 and 1957.  I have received special training in the enforcement of laws concerning controlled substances from the Drug Enforcement Administration (DEA), the Virginia Department of Criminal Justice Services (DCJS), and the Richmond Police Department and the Federal Law Enforcement Training Center (FLETC).  I have testified in judicial proceedings and prosecutions for violations of firearms and controlled substances laws. I have also been involved in various types of electronic surveillance and in the debriefing of defendants, witnesses and

1

informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and the laundering and concealing of proceeds from drug trafficking. I have participated in investigations involving the manufacturing, trafficking, and distribution of illegal narcotics. I have utilized, and am therefore familiar with, the following investigative techniques: consensual and court-ordered electronic surveillance, physical surveillance, pole or other camera surveillance, trash covers, the development and operation of informants and cooperating defendants, the execution of search warrants, consent searches, undercover agent operation, Global Positioning Systems (GPS), parcel package drug interdiction, motel drug interdiction, highway drug interdiction, and the debriefing of defendants, witnesses, informants, and others who have knowledge of drug trafficking and of the laundering and concealing of proceeds from drug trafficking. I have received specialized training in the utilization of these investigative techniques, and have also received specialized training regarding the investigation of criminal gangs and other criminal enterprises.

3.      I have participated in federal electronic wiretap investigations regarding individuals involved in the trafficking and distribution of controlled substances. I am familiar with the ways in which narcotics traffickers conduct their illicit business, including, but not limited to, their methods of importing and distributing controlled substances, as well as their use of telephones and coded language to conduct their transactions.

4.      I know from my training and experience that individuals involved in the trafficking of controlled substances often maintain possession and control of firearms in attempt to protect themselves and their illegal controlled substances enterprise (that is, both their drugs and drug proceeds). Furthermore, drug traffickers will utilize those firearms as a means to intimidate or ensure the loyalty of their associates and/or subordinates and to prevent those with intimate knowledge of the organization from disclosing information to law enforcement.

## PURPOSE OF THE AFFIDAVIT

5.      This affidavit is submitted both in support of an application for a criminal complaint with associated arrest warrant, and also in support of an application for a search warrant, as detailed below.

6.      The requested criminal complaint, charging Matthew HARRISON a/k/a Matt with conspiracy to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of Title 21 United States Code, Section 841 and 846.

7.      The requested search warrants would be for the following location: 2514 South Lockburn Street, Indianapolis, Indiana, further described in Attachment A (hereinafter the Lockburn Street residence, and believed to be Matthew HARRISON's primary residence).

8.      The facts set forth in this Affidavit are based on my personal participation in this investigation and from information provided by detectives, federal agents, federal task force officers, and police officers from various law enforcement agencies, collectively referred to as the "investigators." I am also incorporating my experience, training, and background as a law enforcement officer, narcotics detective and ATF Special Agent. Because this Affidavit is being submitted solely for establishing probable cause to secure authorization for an arrest warrant and search warrant, I have not included each fact known to me concerning this investigation.

## SUMMARY OF INVESTIGATION

9.      On January 28, 2021, investigators with the ATF and with IMPD executed a search warrant at Ricky BLYTHE's Indianapolis, Indiana home.  In searching BLYTHE's home on January 28, 2021, the ATF seized multiple firearms, as well as roughly a kilogram of methamphetamine. BLYTHE was subsequently arrested and has since pled guilty to federal firearms and drug trafficking offenses under cause number 1:21-cr-0047.  Following BLYTHE's January 2021 arrest, investigators obtained court authorization to search BLYTHE's cellular telephone.

10.     A review of BLYTHE's phone revealed a large number of text messages demonstrating that BLYTHE sold methamphetamine to Dylan OSTRUM, and text messages further demonstrated that OSTRUM sold marijuana to BLYTHE. For example, on January 13, 2021, BLYTHE texted OSTRUM, "Wyd [what you doing]," [1] and OSTRUM replied with these texts: "Not shit trying to get some money together, " and, "The weed guy bc he leaves to cali tomorrow he needs 2500 real quick I guess."  On December 30, 2020, OSTRUM texted to BLYTHE, "You told me to tell you when my mexican has those bows [OSTRUM was informing BLYTHE that his Mexican source of marijuana had pounds of marijuana available]," and, "The gas gas for the low low [the Mexican source had marijuana for a low price]." BLYTHE responded that day, "i have some money."  On January 21, 2021, BLYTHE sent OSTRUM a photograph of what appears, from my training and experience, to be a ziploc bag containing a large amount of methamphetamine, and asked OSTRUM, "U need this."  OSTRUM responded in the affirmative.  This is a photograph of the text exchange, which I photographed directly from BLYTHE's cell phone:

---

[1] My interpretation of coded or cryptic language is contained within brackets, and is based on my training and experience, and involvement in this investigation as the lead case agent.



11.     Based upon the evidence gathered on January 28, 2021 from the BLYTHE search warrant, to include, in large part, the volume of text messages relaying a significant drug relationship between BLYTHE and OSTRUM, a search warrant was then sought for OSTRUM's Indianapolis home. While OSTRUM was not unknown to the investigating officers prior to January 28, 2021, the evidence seized from BLYTHE's home corroborated their information about OSTRUM, solidifying their plan to continue their investigation involving OSTRUM.

12.     On February 3, 2021, investigators executed a search warrant at OSTRUM's residence. After OSTRUM waived his *Miranda* rights, he spoke with investigators at his home. OSTRUM acknowledged that he knew BLYTHE had been arrested, and that on the day BLYTHE was arrested,

BLYTHE was supposed to have brought drugs to OSTRUM, but BLYTHE never showed up. OSTRUM originally claimed that he was only receiving "grams" of methamphetamine from BLYTHE, but once confronted with some of the text messages the investigators had on BLYTHE's phone (some of which reference pound quantities of methamphetamine), OSTRUM acknowledged it was a larger amount than what he had previously claimed.

13.     During the interview, texts between OSTRUM and BLYTHE were discussed with OSTRUM, including a text where OSTRUM thanked BLYTHE for giving him (OSTRUM) a gun, and a second text where BLYTHE was asking for a gun. OSTRUM was asked about a number of texts between BLYTHE and OSTRUM where the two discussed drugs—both marijuana and methamphetamine.

14.     During the interview, OSTRUM was asked about his key ring, because there appeared to be keys to bank boxes on the ring. OSTRUM indicated they were actually keys to a safe, which he claimed was empty. "Oh, I don't have any of that stuff here. I don't have any go [meaning, methamphetamine], I don't have any, I got bud [meaning, marijuana], no guns…" OSTRUM claimed that he "got rid of it [the drugs and guns]" after BLYTHE got arrested. OSTRUM was also asked about where his money was located; OSTRUM did not answer the question, but claimed he did not have, "that much [meaning, that much money]."

15.     While at OSTRUM's residence, investigators noted the absence of a Chrysler 300 sedan that they had seen at OSTRUM's residence on multiple occasions prior to February 3, 2021 (which they knew had a license plate to a Cadillac owned by OSTRUM, rather than to the Chrysler 300 to which the plate was affixed). OSTRUM was asked where his car, "the Chrysler" was at; OSTRUM responded that everyone thought it was his, when in fact it was just a rental, and that it was at his father's house. At the conclusion of the interview, OSTRUM claimed that he had moved a gun and "everything" to his dad's house, which he said was two hours away.

16.     As a result of OSTRUM's statements, investigators concluded the interview believing that OSTRUM had stored his contraband (drugs, drug proceeds, and firearms) at a different location following his methamphetamine source's (BLYTHE's) arrest less than a week before their visit to his house (although they were skeptical these items would be found where OSTRUM claimed they were located, at his father's residence). As such, they continued their investigation.

17.     As part of their investigation on February 3, 2021, investigators were able to locate the Chrysler 300 sedan they had previously seen at OSTRUM's residence, finding it backed into the driveway at a residence of 2514 South Lockburn Street, Indianapolis, Indiana—Matthew HARRISON's residence.

18.     As investigators approached the Lockburn Street residence to attempt to make contact with the homeowner, Matthew HARRISON exited the from door of the residence. As HARRISON made eye contact with Agent Bevington (wearing a ballistic vest with ATF/POLICE markings), HARRISON's eyes opened wide and his face turned white; HARRISON then began to sweat profusely. Agent Bevington asked HARRISON if he could speak with him and HARRISON walked toward Agent Bevington. When HARRISON got within a few feet of Agent Bevington, Agent Bevington could smell a strong odor of marijuana coming from HARRISON's person.

19.     Agent Bevington detained HARRISON and advised HARRISON of his *Miranda* warnings, which HARRISON waived and agreed to speak with investigators.  In the interview that followed, HARRISON stated that OSTRUM had parked the Chrysler 300 at his house the previous day (February 2, 2021) but denied having keys to the vehicle.  HARRISON told investigators he had purchased small amounts of marijuana from OSTRUM, but stated he was only a drug user, not a trafficker. HARRISON was released after being interviewed by investigators.

20.     On February 3, 2021, HARRISON's mother (Laurie HARRISON) signed a consent form to allow a Indianapolis Metropolitan Police Department (IMPD) K-9 officer and his certified narcotics K-

9 to run an "open-air" sniff on the property (to include the Chrysler); when this occurred, the K-9 did not alert to the odor of narcotics at the Chrysler. Officers were able to view the Chrysler's Vehicle Identification Number (VIN) through the windshield. That VIN was queried through law enforcement databases, and that query revealed that the Chrysler 300 was a rental car that had been reported stolen in October 2020. The query revealed that the car had been reported stolen and entered as a stolen vehicle into the National Crime Information Center (NCIC).

21.     Since the Chrysler 300 was a stolen vehicle, it had to be towed from of the property, so that it could ultimately be claimed by the owner. Investigators conducted an inventory search of the vehicle in preparation to tow this stolen vehicle, which was conducted pursuant to the IMPD inventory search policy.

22.     While searching the vehicle, investigators located a safe in the trunk. Investigators utilized the key from OSTRUM's keychain to unlock the safe (they had seized the keys pursuant to the search warrant at OSTRUM's residence). Inside the safe, investigators located a loaded Glock 9mm pistol; and what later forensically tested as 513.5 grams of methamphetamine (actual); and what appeared to agents to be a drug ledger (that is, a notebook containing first names and various amounts written beside them, to include "Matt."  A photograph of this drug ledger:



Investigators located a second safe in the backseat of the vehicle; they used a key from OSTRUM's keychain to unlock that safe, and recovered an extended Glock magazine loaded with 9mm ammunition, marijuana[2], and a digital scale.

23.    OSTRUM was subsequently charged federally for possession of over 50 grams (actual) methamphetamine with the intent to distribute and possession of a firearm by a convicted felon under cause number 1:21-cr-0047.  OSTRUM is currently pending trial in United States District Court.

---

[2] The recovered marijuana was submitted to the Indianapolis-Marion County Forensic Services Agency (I-MCFSA) for drug analysis.  The I-MCFSA only analyzed a percentage of the controlled substances seized.  Per the official lab report, the analyzed marijuana weight approximately 242 grams.

24.     Following OSTRUM's arrest, investigators obtained court authorization to search OSTRUMS's cellular telephone.

Communications between HARRISON and OSTRUM

25.     While reviewing data recovered from OSTRUM's phone, investigators reviewed numerous text messages (SMS) between OSTRUM and "Matt" (HARRISON)[3] utilizing telephone number 317-742-2985. Approximately 1570 pages of text messages containing conversations between OSTRUM and HARRISON from November 2020 to February 3, 2021 were extracted from OSTRUM's phone. Based upon these conversations set forth below, I believe HARRISON and OSTRUM worked jointly (conspired) to distribute large quantities of methamphetamine and other controlled substances as well as firearms and stolen property. It further appears that OSTRUM frequently fronted (i.e, provided on consignment) HARRISON quantities of methamphetamine and other controlled substances that HARRISON then sold in order to pay OSTRUM.

26.     For example, On November 4, 2020, OSTRUM sent HARRISON a message asking, "Do you have any cash for go [did HARRISON have cash available to purchas methamphetamine]??" HARRISON replied, "I might have some strips [HARRISON had suboxone available]." OSTRUM asked, "How many?" HARRISON replied, "I'm not sure about em ye [yet]."

27.     On November 6, 2020, OSTRUM sent HARRISON a message asking, "What's up?" HARRISON replied, "Bro I got you come thru." OSTRUM asked, "Do I need to bring anything [did HARRISON need any additional controlled substances]?" HARRISON replied, "Hopefully you can bring

---

[3] I believe the contact listed as "Matt" in OSTRUM's cellular phone is in fact Matthew HARRISON based on several of the text messages described in greater detail below. On more than one occasion, the individual labeled as "Matt" in OSTRUM's phone provided via text his address as 2514 South Lockburn Street; I am unaware of any "Matt" other than Matthew HARRISON residing at the residence. Further, OSTRUM and "Matt" talk about the Chrysler 300 detailed above, in very specific detail prior to OSTRUM's February 3, 2020 arrest. Investigators have subpoenaed T-Mobile to obtain the subscriber information for this phone but have not received a return as of the drafting of this Affidavit.

me two more [HARRISON needed two additional amounts of methamphetamine]." OSTRUM asked, "How much cash do you have??" HARRISON replied, "700 right now." OSTRUM asked, "And that would put us at…800? Or 1500 [OSTRUM was asking about the ongoing debt that HARRISON owed to OSTRUM from past drug transactions]?" HARRISON replied, "17…1500 I mean." OSTRUM responded, "You giving me the 700 would put us at 15." HARRISON agreed, "Right…That leaves me broke." OSTRUM asked, "And you want me to bring you two?" HARRISON replied, "Yes…Maybe one for now…To get caught up a bit." OSTRUM replied, "If you want me to bring you two I will [despite the outstanding drug debt, OSTRUM was willing to bring HARRISON two ounces of methamphetamine as HARRISON had originally requested]. I just really hope you start coming out of the hole. I'm putting a lot of faith into you."

28.     On November 8, 2020, OSTRUM sent HARRISON a message asking, "And what's up with that car?" HARRISON replied, "Haven't talked to her about it yet…And I need a pistol out of the deal somehow." OSTRUM replied, "I can get you a Mac 11." HARRISON asked, "In the deal?" OSTRUM replied, "Yah." HARRISON asked, "What bout 380?" OSTRUM responded, "Mac 11…If you're willing to take cash and you want to pistol I probably got you with $800 cash in the Mac 11." In this conversation, I believe that OSTRUM was indicating his willingness to get HARRISON a Mac 11 handgun.

29.     On November 12, 2020, HARRISON sent OSTRUM a message stating, "I got ppl here waiting on go [HARRISON had methamphetamine customers lined up]." OSTRUM asked, "Where you at?" HARRISON replied, "Home." OSTRUM responded, "Ok send me your address." HARRISON replied, "2514 S Lockburn."

30.     Later in the day on November 12, 2020, HARRISON followed up on the November 8, 2020 conversation detailed above regarding trading firearms and currency for a vehicle (presumably a

stolen vehicle based on my review of the entire conversation). In this November 12, 2020 text conversation, HARRISON told OSTRUM, "She said she would do it for a stack the Mac and pistols [an unknown female was willing to sell the car they had been discussing in exchange for $1,000 in cash as well as firearms]." OSTRUM replied, "He doesn't have the Mac anymore. He has some kind of assault rifle…He's wanting to sell." HARRISON asked, "Okay like AR or something?" OSTRUM replied, "Yeah, I think so…And it's nice as fuck."

31.     On November 13, 2020, HARRISON sent OSTRUM a message stating, "Bro, I need some go [HARRISON needed more methamphetamine]." OSTRUM asked, "How much do you need?" HARRISON replied, "1 atleast [HARRISON needed an ounce, at minimum]." OSTRUM responded, "Damn, lol you should have hella bread [money] then." HARRISON replied, "Why is that…I gave you 850 of it yesterday." OSTRUM replied, "I know that makes us at the 1700." I believe in this conversation, the two were continuing their dialogue about the status of the drug debt.

32.     Later in the day on November 13, 2020, HARRISON and OSTRUM continued their conversation regarding trading for a (likely stolen) vehicle.  OSTRUM sent HARRISON a message stating, "Matt she wanted 700 and a gun.  I'm offering 2 oz of ice [the seller of the car wanted to be paid $700 and a firearm, but OSTRUM wanted to counter-offer with two ounces of methamphetamine]." HARRISON replied, "Okay I'll ask her hold on."

33.     On November 16, 2020, HARRISON sent OSTRUM a message stating, "I'm just saying it's not that great bro." OSTRUM asked, "The ice?...It's been the same shit." HARRISON replied, "I'm just the messenger…I personally think it's not bad 7/10."  I believe in this conversation, HARRISON was complaining about the quality of methamphetamine that he had received from OSTRUM, indicating that at least one of his customers had complained about it ("I'm just the messenger").

34.     Later in the day on November 16, 2020, HARRISON sent OSTRUM a message stating, "Ik bro I fucked up but that the reason why I only asked for one last time so I could get caught up a little." OSTRUM responded, "I'll bring you one bro [OSTRUM was willing to bring HARRISON another ounce of methamphetamine].  I'm about to be on my way." HARRISON replied, "Okay well imma go drop it off real quick after u get here with the cash for it [HARRISON already had a customer lined up and waiting for the ounce of methamphetamine]." OSTRUM replied, "I'm here." HARRISON responded, "Come in." OSTRUM replied, "Come out here. And I don't have a full oz I thought it was [OSTRUM had less than a full ounce]." HARRISON replied, "Bro I'm not doing anything in the front yard sorry [HARRISON wanted OSTRUM to come inside his house, rather than conduct the drug deal in the front yard]." OSTRUM replied, "Lol I'm in your drive way here I come."

35.     On November 24, 2020, HARRISON sent OSTRUM a message stating, "Different go. cause u keep giving me zips [ounces] of shake [low quality methamphetamine] can't do it." OSTRUM replied, "I gave you one shard [OSTRUM had given HARRISON high quality methamphetamine]…Last Night…It hasn't been shake."

36.     On November 27, 2020, HARRISON sent OSTRUM a message asking, "Need a laptop?" OSTRUM asked, "What kind?" HARRISON replied, "HP…I'm bringing it I'm almost to your house now."

37.     On November 29, 2020, HARRISON asked OSTRUM, "You got another?" OSTRUM asked, "Another oz of ice [was HARRISON needing another ounce of methamphetamine]?" HARRISON replied, "Yea." OSTRUM affirmed, "Yes."  HARRISON clarified, "Actually I need 2 ½ [HARRISON needed two and a half ounces of methamphetamine]."  OSTRUM asked, "When?" HARRISON replied, "On my way!"

38.     On December 1, 2020, HARRISON sent OSTRUM a photograph of two firearms. OSTRUM responded, "So you got both of those guns and how much cash?" HARRISON replied, "Bri (bro) these are mine lol [HARRISON was not trying to sell the firearms in exchange for methamphetamine, he wanted to keep the firearms for himself]." OSTRUM responded, "Fair enough."

39.     On December 19, 2020, HARRISON sent OSTRUM a message stating, "Imma need atleast one of fast [HARRISON needed at least an ounce of methamphetamine]." OSTRUM replied, "Ok." OSTRUM then said, "Bring me the roxys [oxycodone pills] you have left." HARRISON replied, "Someone's coming to get them in the morning."

40.     On December 20, 2020, HARRISON sent OSTRUM a message stating, "I need 2 more." OSTRUM replied, "Yah."  HARRISON then asked OSTRUM, "Can you bring?" OSTRUM replied, "Never on a Sunday."  HARRISON said, "Okay well I'll be over when I get a ride."

41.     On December 21, 2020, HARRISON sent OSTRUM a message stating, "Bro imma need another one of go zip [HARRISON needed another ounce of methamphetamine]." OSTRUM replied, "I got hella [OSTRUM had a large quantity of methamphetamine]."  HARRISON said, "Chunky as possible [HARRISON wanted large shards if possible, as that is generally indicative of higher quality methamphetamine]."  OSTRUM replied, "Always."

42.     On December 22, 2020, HARRISON sent OSTRUM a message stating, "2 ppl o.d. Ed on those Roxys [two people had overdosed on the oxycodone that the two had just discussed on December 19, 2020]."  OSTRUM replied, "Fr [for real]?" OSTRUM further asked, "Like dead?" HARRISON replied, "Fr not dea.. but 2 ppl on 1 pill." OSTRUM said, "God damn nigga."  HARRISON replied, "Yeah I know.. fentemal [HARRISON believed there was fentanyl mixed in the oxycodone]."  Based on my experience, drug traffickers commonly 'press' (i.e. manufacture) their own pills that contain quantities of

fentanyl and methamphetamine.  The purchaser believes they are purchasing actual oxycodone when in fact he/she is purchasing whatever substance(s) were placed in the press when the pill was manufactured.

43.     On December 29, 2020, HARRISON sent OSTRUM a message asking, "Can I come grab em or do I need all the money first [was OSTRUM willing to front HARRISON more controlled substances, or did he want to be paid up front]?"  OSTRUM replied, "Well if I front you can we really start keeping the number and getting more professional with our money [OSTRUM was growing frustrated with the lack of record keeping with their ongoing drug debt]. And."  HARRISON replied, "Okay bet that a deal." HARRISON further stated, "So don't you have dry erase borax [did OSTRUM have a dry erase board so that they could write out the debt owed to OSTRUM]." HARRISON then asked, "Okay can I come thru?" OSTRUM said, "I have pin [pen] and paper." HARRISON asked again, "Okay so can I come thru…And grab them…And maybe some more bud [in addition to methamphetamine, HARRISON also wanted to purchase marijuana]?"  OSTRUM replied, "Yes."

44.     On December 31, 2020, HARRISON sent OSTRUM a message stating, "And I'm gonna need 2 more zippers of the go [HARRISON needed two ounces of methamphetamine] too." OSTRUM replied, "Let me get 700 for the qp [OSTRUM wanted to charge $700 for a quarter pound of marijuana] and you want two zips of go!"

45.     On January 1, 2021, HARRISON sent OSTRUM a message stating, "I need a zip of bud (not the purple yet) the same 150 as I got yesterday and like 20 bars [HARRISON wanted an ounce of marijuana, and twenty Xanax pills]." OSTRUM replied, "No ice [methamphetamine]?" OSTRUM said, "Im ready." HARRISON replied, "Not at the moment." OSTRUM stated, "Ok." HARRISON then sent a message to OSTRUM stating, "Okay I need 2 zips of faster than fast [HARRISON needed two ounces of methamphetamine] and a zip and a half of the greenhouse [an ounce and a half of marijuana]."  OSTRUM replied, "Ok."

46.     On January 10, 2021, HARRISON sent OSTRUM a message stating, "I'm about to come get 2 wholes." HARRISON further stated, "Flash [methamphetamine]." OSTRUM replied, "Bet it up." HARRISON said, "As less shake as possible." OSTRUM replied, "No shake."

47.     On January 12, 2021, HARRISON sent OSTRUM a message stating, "Someone came into my room while I was sleeping a took a o and a half [HARRISON believed someone had stolen an ounce and a half of methamphetamine from his room while he was sleeping in it]." OSTRUM replied, "God damn !!...Of fast [methamphetamine]?" HARRISON stated, "Yup."

48.     On January 13, 2021, HARRISON sent OSTRUM a message stating, "I need 2 wholes of Ricky Bobby [two ounces of methamphetamine]." OSTRUM replied, "I got you," and, "I'm wbout [about] to send my guy to you with those [OSTRUM had a drug associate that he was going to send to HARRISON's house to drop off the methamphetamine]." HARRISON responded, "Okay can u tell him to come to me please?" OSTRUM replied, "Address?" HARRISON responded, "2514 S Lockburn St" followed by, "Send extra half [requesting an additional fourteen grams be sent to him through the courier]."

49.     On January 25, 2021, HARRISON sent OSTRUM a message stating, "Bro that shit is not gonna work…I Guess 5 ppl have said something about it. can't get anything else [HARRISON's methamphetamine customers were not happy with the quality of the methamphetamine that HARRISON had received from OSTRUM]?" OSTRUM responded, "??...The two ozs?...Its better then that last shit." HARRISON replied, "All of it." OSTRUM responded, "I just got that shit last night, it looked like shards and it wasn't cheap…Idk why everybody liked that last shit so much…I hope you don't feel like im trying to get over on you ill refund the shit or trade it out whatever you need bro if your people aren't trying to take it." In this conversation, I believe that OSTRUM was defending the quality of the methamphetamine that he had sold to HARRISON.

50.     On January 29, 2021, HARRISON sent OSTRUM a photo of a semiautomatic pistol.

51.     As set forth above, on January 28, 2021, Ricky BLYTHE was arrested by the ATF.  On January 29, 2021, OSTRUM sent HARRISON a message stating, "Im going to be back on bro..The plug came to me…Like rickys plug [Ricky BLYTHE's methamphetamine source had contacted OSTRUM, and it appeared OSTRUM believed BLYTHE's source was willing to sell methamphetamine directly to OSTRUM]."  HARRISON responded, "Damn…So we getting it cheaper?"

52.     On January 31, 2021, OSTRUM sent HARRISON a message stating, "Well it's a big ass black dude who im getting dronted [fronted] by now…not my brother [BLYTHE].  So lets get you down to the zero with this new ice."  HARRISON responded, "Sounds good to me too bro."  I believe in this conversation, OSTRUM was pointing out to HARRISON that OSTRUM was no longer obtaining methamphetamine from his close friend, Ricky BLYTHE, but rather, from a new source, with whom he did not have as close a relationship.  Accordingly, OSTRUM wanted HARRISON to pay down his outstanding debt to OSTRUM.

53.     On February 2, 2021, HARRISON sent OSTRUM a message asking, "You okay bro?"  OSTRUM responded, "Nah im kinda shitty."  HARRISON asked, "What happens…Happened" and OSTRUM responded, "The trailer," which I believe to be a reference to a stolen trailer that HARRISON had provided to OSTRUM, so that OSTRUM could sell it.  HARRISON replied, "It was stolen?"  OSTRUM responded, "Hotter than a fire cracker."  HARRISON replied, "Are you fucking serious enough."  OSTRUM then sent several pictures to HARRISON from OSTRUM's home surveillance system of IMPD officers towing the trailer from the yard of OSTRUM's residence.  OSTRUM stated via text, "Bro I left and they pulled up right behind me while I was in the 300 bro [referencing a Chrysler 300 that OSTRUM had been surveilled in during the investigation; as set forth above, that was a stolen vehicle]."  HARRISON replied, "Well ik who I got it from."  OSTRUM said, "But they probably wont

pay us back." HARRISON responded, "They prolly don't have it to pay but I'll give you some so ur not taking the whole hit [HARRISON agreed to provide OSTRUM with some money that he was out, having paid money for the stolen trailer, but not having been able to recoup that money by selling the stolen trailer to someone else]." OSTRUM replied, "Bro you just worry about the mon y for the shit don't worry about the money for the trailer." HARRISON replied, "I have a stack [$1,000] for you cash rn." Later in the conversation, OSTRUM said, "I'm about to put a lot of trust in you matt. Please for the love of god don't fuck me now on this shit that's happening  We got to keep it 100% with each other and im scared to give you my keys but I have to [although OSTRUM was reluctant to give HARRISON the keys to the Chrysler 300, he was going to do so]." HARRISON replied, "Bro you can trust me 100%.. 100% of the time." OSTRUM said, "You knew that trailer was stolen…Bro that almost ruin my whole life.  My safe was in the 300 [that is, the safes that were seized on February 3, 2021, which contained methamphetamine and marijuana and a loaded Glock]…They came here hard." HARRISON responded, "I didn't know the thing was stolen…Are you serious?!?" OSTRUM replied, "Bro we both knew…Yah we are getting enough money with the super heroes [methamphetamine] to not need those kind of ups anymore [OSTRUM believed that they were both making enough money from selling methamphetamine so as to not need to deal in stolen property anymore]."

    HARRISON's Illegal Use of Controlled Substances

54.    Through my review of the hundreds of text messages between OSTRUM and HARRISON between September 2020 and February 3, 2021, I know that HARRISON was routinely using controlled substances, to include marijuana and methamphetamine.  As set forth above, HARRISON would, on occasion, complain about the quality of methamphetamine, giving his personal opinion as to whether the methamphetamine was quality or not (which opinion sometimes deviated from the opinion of his own customers).  On multiple occasions, HARRISON and OSTRUM discussed not just selling marijuana, but

using it as well.  Additionally, HARRISON possessed firearms in this time period (such as on December 31, 2020, when he texted OSTRUM a photograph of two firearms and said, "those are mine.").  As such, between September 2020 and February 3, 2021, I believe that HARRISON was an unlawful user of controlled substances in possession of one or more firearms, in violation of Title 18, United States Code, Section 922(g)(3).

HARRISON's criminal history

55.     A computerized criminal history check (CCH) of HARRISON showed that HARRISON had been arrested on numerous occasions in the past for controlled substance related offenses.  In 2005, HARRISON was found guilty of misdemeanor operating a vehicle with Schedule I or II Controlled Substance or its Metabolite in the Body, under cause #70D01-0502-CM-000028.  In 2019, HARRSION was arrested for misdemeanor possession of marijuana in Marion County, Indiana.  This case was dismissed after HARRISON successfully completed pre-trial diversion.  In 2021, HARRISON was arrested for operating a vehicle while intoxicated in Clinton County, Indiana.  Search incident to arrest, officers recovered approximately ten grams of methamphetamine and a quantity of marijuana from HARRISON's person.  This case was later dismissed after HARRISON successfully completed pre-trial diversion.

Verification that HARRISON is still residing at the Lockburn Street residence

56.     On July 26, 2021, investigators conducted surveillance on the Lockburn Street residence. Investigators observed HARRISON inside the detached garage of the residence; HARRISON appeared to be loading unknown items into a Chrysler sedan that was parked inside the garage.  A query through the Indiana Bureau of Motor Vehicles shows that HARRISON currently has a 2005 Chrysler 300 sedan registered to him at the Lockburn Street residence.

57.     A short time later, investigators observed a male later identified by law enforcement as C. Daniel Williamson arrive and park in the driveway of the Lockburn Street residence.  HARRISON exited the garage and met with Williamson in the driveway.  Williamson was seen opening the rear passenger door of his vehicle and handed HARRISON a laptop computer that was still in the box, several audio speakers, and various clothing items.  HARRISON appeared to inspect these items and then carried these items into the Lockburn Street residence, followed by Williamson.

58.     Investigators conducted a CCH on Williamson and learned Williamson had sustained numerous felony convictions in Indiana, to include: auto theft, possession of a narcotic drug, and burglary.

59.     Based on the investigation to date and Williamson's CCH, I believe HARRISON was likely obtaining stolen items from Williamson, possibly in trade for controlled substances.

60.     Investigators also observed a second male present at the Lockburn Street residence with HARRISON and Williamson; this male was identified by law enforcement as Corbin Baker. A CCH on Baker showed Baker had sustained numerous felony convictions in Indiana, to include: burglary, theft, possession of methamphetamine and possession of a syringe.

61.     Based on Baker's criminal history and observations made by investigators during surveillance, I believe Baker's visit to the Lockburn Street residence was likely criminal in nature as opposed to a social visit.

**Characteristics of Residential Searches**

62.     I am seeking authorization to search the residence utilized by Matthew HARRISON, whom I believe to be currently involved in the trafficking of narcotics and to be an unlawful user of controlled substances in possession of one or more firearms, based on investigation to date.  In a substantial number of residential searches executed in connection with the drug and gun investigations in which the ATF has participated, the following kind of drug-related evidence have typically been recovered:

a.      Drug or money ledgers, drugs distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when drugs were obtained, transferred, sold, distributed, and/or concealed;

b.      Articles of personal property and documents generated during their time trafficking drugs that establish and document the acquisition, movement, and spending of large sums of money generated from drug trafficking activities including: the purchase of real estate and conveyances, as well as shell corporations and business fronts to conceal the true ownership and illegal source of the proceeds, ledger books, financial instruments purchased with large amounts of currency derived from the sale of heroin or other controlled substances, including wire transfers, traveler's checks, stock certificates, money orders, cashier's checks, and certificates of deposit, securities, letters of credit, and brokerage houses. Documents pertaining to foreign and domestic bank accounts and their attendant generated from the sale of controlled substances;

c.      Personnel records for any and all employees and/or sub-contractors including applications, employment agreements, Forms W-2, Forms 1099, and/or payroll registers;

d.      All state and federal income tax returns, whether individual or corporate returns, filed or not filed, and supporting work papers, summary sheets and analyses used in the preparation of the tax returns, or any other documents showing employment or business history, whether or not such employment or business may be fictitious;

e.      All state and federal employment related tax returns and forms, whether filed or not filed, and supporting work papers, summary sheets and analyses used in the preparation of the tax returns and forms, or any other documents related to employment;

f.      Bank records, credit card account records, brokerage account records, investment records, financial institution records and any other records reflecting the potential receipt of income,

transfer of assets or expenditure of income including, but not limited to, periodic statements, deposit receipts, records of wire transfers, checks, drafts, safety deposit box records, money orders, check ledgers, certificates of deposit, checkbooks, loan statements, documents related to the ownership or purchase of real property, documents relating to the purchase of durable goods or luxury items, including vehicles, jewelry and appliances;

g.      Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes and documents, and other items, and reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

h.      Records of off-site locations to store records, including safe deposit boxes, rental agreements for storage facilities, and other such records and receipts;

i.      Indicia of occupancy, residency, or ownership and control of the premises and other, off-site locations, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease of rental agreements, settlement statements, addressed envelopes, escrow documents, and keys;

j.      Records of mail and communications services, telephone pagers, answering machines, electronic pagers, and cellular telephones, which evidence participation in a conspiracy to distribute controlled substances;

k.      Cellular telephones, telephone pagers, electronic pagers, answering machines (including information contained within these devices, such as the telephone number and or direct connect number, and/or name and identity assigned to the phone; digital, cellular and/or telephone numbers and direct connect numbers, and/or names and identities stored in the directory; telephone numbers and direct connect numbers dialed from or received by the phone and stored in memory; stored voice mail recordings

sent to the phone; stored text messages sent to, or sent from, the phone; and any other electronic mail, stored videos or photographs, or any other electronic data stored within the phone and/or the memory of the phone) all of which may be retrieved and reviewed through later forensic examination of the relevant devices pursuant to Federal Rule of Criminal Procedure 41;

   l. As used above, the terms records, documents, programs, applications or materials includes records, documents, programs, applications or materials created, modified or stored in any form;

   m. Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

   n. Any computer equipment and storage device (such as a DVR or media storage device) capable of being used to commit, further or store evidence of the offense listed above.

  63. Based on my training and experience, I am aware that drug traffickers generally store their drug-related paraphernalia in their residences or the curtilage of their residences, as well as the 'stash houses' they use to further their drug trafficking activity.  Drug traffickers generally maintain records relating to their drug trafficking activities in their residences or the curtilage of their residences (even if the drug trafficking activity has concluded or is paused).  Because drug traffickers often "front" (that is, sell on consignment) controlled substance to their customers, or alternatively, will be "fronted" controlled substances from their suppliers, such record keeping becomes necessary to keep track of amounts paid and owed, and drug traffickers typically maintain these records close at hand to readily ascertain current balances.  Often, drug traffickers keep "pay and owe" records to show balances due for drug payments in the past ("pay") and for payments expected ("owe") to and from the trafficker's supplier and the trafficker's dealers.  Additionally, drug traffickers typically maintain telephone and address listings of

customers and suppliers and keep them immediately available so that they can efficiently conduct their drug trafficking business.

64.     I have learned through my training and experience that drug traffickers typically use wire transfers, cashier's checks, and money orders to pay for controlled substances.  Drug traffickers also typically maintain evidence, frequently for extended periods of time (sometimes spanning years) of such financial transactions and records relating to income and expenditure of money at their residences or the curtilage of their residence.

65.     I know that computer hardware, software and electronic files may be important to a criminal investigation because the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data.  Rule 41 of the Federal Rules of Criminal Procedure permits the government to search for and seize computer hardware, software and electronic files that are evidence of crime, contraband, instrumentalities of crime, and or fruits of crime.  In this case, the warrant application requests permission to search and seize records and documents relating to the trafficking of the substances identified in this investigation.  These records constitute evidence of crime.  This affidavit also requests permission to seize the computer hardware that may contain these records if it becomes necessary for reasons of practicality to remove the hardware and conduct a search offsite.  I believe that, in this case, the computer hardware is a container for evidence and also an instrumentality of the crimes under investigation.

66.     I know that cellular telephones are important to a criminal drug investigation because cellular telephones may be evidence or instrumentalities of crime, and/or may be used as storage devices that contain evidence of crimes in the form of electronic data.  In this case, the warrant application requests permission to search and seize records relating to the trafficking of the substances identified in this investigation.  These records constitute evidence of crime.  I also request permission to seize the cellular

telephones that may contain these records and search the memory of the cellular telephones. I believe that, in this case, cellular telephones (including saved voice mails, data files, photo and video files, and text messages) are a container for evidence and instrumentalities of the crimes under investigation.  Through my training and experience, I know that drug traffickers routinely possess more than one phone in furtherance of their drug trafficking, and frequently compartmentalize their drug trafficking by using phones for separate purposes (e.g., they may use one phone to speak to sources, another to speak to customers, etc…).

67.     Moreover, I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, as well as other brands of cellular phones, that some models of Apple devices such as iPhones and iPads, as well as other brands of cell phones, offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password.  This feature is called Touch ID.

68.     If a user enables Touch ID on a given cellular device, he or she can register multiple fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) found at the bottom center of the front of the device.  In my training and experience, users of cellular devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

69.     In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead.  These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked cellular device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) five unsuccessful attempts to unlock the device via Touch ID are made.

70.     The passcode or password that would unlock the cellular device(s) found during the search of the Subject Premises is not known to law enforcement.  Thus, it will likely be necessary to press the finger(s) of the user(s) of the cellular device(s) found during the search of the Subject Premises to the device's Touch ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant.  Attempting to unlock the relevant cellular device(s) via Touch ID with the use of the fingerprints of the user(s) is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

71.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device via Touch ID, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, it will likely be necessary for law enforcement to have the ability to require

any occupant of the Subject Premises to press their finger(s) against the Touch ID sensor of the locked cellular device(s) found during the search of the Subject Premises in order to attempt to identify the device's user(s) and unlock the device(s) via Touch ID.

72.     Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience I know that it is common for a user to unlock a Touch ID-enabled device via the fingerprints on thumbs or index fingers.   In the event that law enforcement is unable to unlock the cellular device(s) found in the Subject Premises as described above within the five attempts permitted by Touch ID, this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

73.     Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at the Subject Premises to the Touch ID sensor of the cellular device(s), such as an iPhone or iPad, found at the Subject Premises for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

74.     My awareness of these drug trafficking practices, as well as my knowledge of drug use and distribution techniques as set forth in this Affidavit, arises from the following: my involvement in prior drug investigations and searches during my career as a law enforcement officer, as previously described; my involvement on a number of accessions in debriefing confidential informants and cooperating individuals in prior drug investigations, as well as what other agents have advised me when relating the substance of their similar debriefings and the results of their own drug investigations; and other intelligence information provided through law enforcement channels.

75.     In a number of residential searches in prior investigations that I have been involved in, the types of evidence identified in Attachment "B" have typically been recovered from the main residence and from other structures and areas on the properties being searched, for example, other storage

lockers/areas, detached closets, containers, and yard areas associated with the main residence and used in connection with or within the curtilage of said residence (including vehicles that are maintained and stored on the curtilage of a main residence).

## USE OF THE TARGET LOCATION BY MATTHEW HARRISON

76.     I am requesting authorization to search 2514 South Lockburn Street, Indianapolis, Through investigation and as set forth above, I believe that the Lockburn Street residence has been utilized by HARRISON for the purpose of storing and selling controlled substances, firearms and stolen property. Investigators have reviewed text messages between HARRISON and co-conspirator OSTRUM demonstrating that quantities of controlled substances were delivered to HARRISON and the Lockburn Street residence on numerous occasions during the course of this conspiracy.  Further, HARRSION has previously told investigators that he resided at the Lockburn Street residence when HARRSION was interviewed in February 2021.  Following this interview, investigators recovered a firearm and controlled substances from co-conspirator OSTRUM's vehicle which HARRISON had allowed OSTRUM to store at the Lockburn Street residence.  I believe, through investigation to date, that HARRISON still resides at the Lockburn Street residence.  On July 26, 2021, investigators observed HARRISON at the Lockburn Street residence with his vehicle stored in the garage, engaged in what appeared to be criminal activity with previously convicted felons, as described in greater detail above.

77.     Based in the facts set forth in this Affidavit, I believe evidence supporting Matthew HARRSION's involvement in the distribution of controlled substances will be recovered inside the residence of 2514 South Lockburn Street.

78.     Based on the facts provided in this Affidavit, I further believe that Matthew HARRISON conspired with Dylan OSTRUM, and others both known and unknown to distribute more than 500 grams of methamphetamine between September 2020 and February 3, 2021.

## CONCLUSION

79.     The government requests the Court to maintain this Affidavit and all related documents remain under seal until further order of the Court.  This Affidavit contains extensive reference to an ongoing investigation that includes individuals other than Collin MOORE; as such, disclosure of this investigation at this time would jeopardize an ongoing ATF investigation.  Disclosing the contents of this Affidavit would alert targets of this investigation to the existence of the ATF investigation in this matter. As a result, the targets may flee the jurisdiction and destroy evidence that ATF might otherwise obtain during the course of the ongoing investigation.

80.     WHEREFORE, based upon the information contained in this Affidavit, probable cause exists to believe that the articles identified on Attachment "B" are present at the premises to be searched.


/s/ Todd Bevington
Special Agent, ATF


Attested to by the applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by telephone.


Date:  7/29/2021

Paul R. Cherry
United States Magistrate Judge
Southern District of Indiana